**UNITED STATES of America, Plaintiff,**

v.

**SIX NEGOTIABLE CHECKS IN VARIOUS DENOMINATIONS TOTALING ONE HUNDRED NINETY ONE THOUSAND SIX HUNDRED SEVENTY ONE DOLLARS AND SIXTY NINE CENTS ($191,671.69), and Eight Thousand Five Hundred Fifty Nine Dollars in United States Currency ($8,559.00), Defendants.**

No. 01–71679.

United States District Court,
E.D. Michigan,
Southern Division.

June 27, 2002.

Tauras N. Ziedas, U.S. Attorney, Detroit, MI, for plaintiff.

Ziad A. Fadel, Dama J. Brown, Dearborn, MI, for defendant.

## OPINION AND ORDER REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiff United States of America commenced this suit on April 30, 2001, seeking the civil forfeiture of the Defendant negotiable checks and U.S. currency, which were seized on November 28, 1998 by agents of the U.S. Customs Service at the Detroit Metropolitan Wayne County Airport in Romulus, Michigan. The Government alleged in its complaint that there is probable cause to forfeit this property, because the checks and currency are monetary instruments that Leila Farha attempted to transport out of the United States without properly reporting them to customs agents as required under 31 U.S.C. § 5316. Two Claimants, Leila Farha and her husband Amado Faria, have filed claims in opposition to the Government's forfeiture effort, asserting that they committed no wrong that would warrant the Government's seizure of the Defendant property from them.

By motion filed on January 31, 2002, the Government now seeks summary judgment in its favor and the entry of a final order of forfeiture, arguing that the record conclusively establishes probable cause for the forfeiture of the Defendant checks and currency, and that, as a matter of law, Claimants cannot establish any affirmative defense to this forfeiture. Claimants responded to this motion on March 8, 2002, contending that the Government bears a higher burden than probable cause under recently enacted federal legislation, and that issues of fact preclude a determination as a matter of law as to whether the Government has met this burden or whether Claimants, in turn, can establish a defense to forfeiture. Claimants also challenge the forfeiture as grossly disproportionate to any alleged wrongdoing, and hence violative of the Eighth Amendment prohibition against "excessive fines," U.S. Const. amend. VIII, and they contend that the Government's delay in commencing this action violated their constitutional right to due process.[1] The Government addressed these arguments in a reply brief filed on March 18, 2002.

The Court heard oral argument on the Government's motion on June 20, 2002. Having reviewed the parties' briefs and supporting exhibits, and having considered the arguments of counsel at the June 20 hearing, the Court is now prepared to rule on this motion. This Opinion and Order sets forth the Court's rulings.

### II. FACTUAL AND PROCEDURAL BACKGROUND

On November 28, 1998, U.S. customs officials stopped and questioned Claimant Leila Farha as she was about to board Northwest Airlines Flight Number 68 at the Detroit Metropolitan Airport in Romulus, Michigan. Farha, a naturalized U.S. citizen, had planned to travel from Detroit to Tel Aviv, Israel to visit her sister.

According to Stephen L. Clark, the customs inspector who questioned Farha at the airport that day, Farha was advised of the relevant currency reporting requirements, and was told that she must declare

---

1. Through their response, Claimants also request the entry of summary judgment in their favor, apparently on due process grounds. In light of the Court's disposition of this due process claim, there is no need to decide whether Claimants properly and timely moved for summary judgment in their favor.

any currency, travelers' checks, and other negotiable monetary instruments totaling more than $10,000.00. (*See* Plaintiff's Reply Br., Ex. M, Clark Aff. at ¶ 7; *see also* Plaintiff's Motion, Ex. A, Investigative Report at 2.) Farha disputes this, stating in an affidavit that she believed that she was only required to disclose the amount of currency that she was carrying, and that she was never told that her reporting duties encompassed negotiable checks. (*See* Claimants' Response, Ex. B, Farha Aff. at ¶¶ 6–7.)

In any event, in response to Clark's inquiry, Farha stated that she was carrying $9,000.00 in cash. Clark states that he offered Farha the opportunity to amend her declaration, and that he specifically advised her of the need to report the transportation of monetary instruments on behalf of others. (Clark Aff. at ¶ 9.) Farha, however, declined this invitation, and again stated that she was carrying only $9,000.00 in cash. Upon searching Farha's purse, Clark discovered $8,559.00 in cash, along with 13 commercial checks totaling $250,671.69. Six of these checks were negotiable, totaling $191,671.69. These six checks, along with the $8,559.00 in cash that Farha was carrying, are the property at issue in this civil forfeiture action.[2]

Upon discovering these items, U.S. customs officials escorted Farha to an office, advised her of her *Miranda* rights, and questioned her further about the checks found in her purse. According to a Customs Service investigative report, Farha stated that two of the negotiable checks, in the amounts of $107,117.98 and $64,553.71, were the proceeds of a sale of certain land in Florida. These checks were made out

to, and appeared to be endorsed by, Farha's husband, Claimant Amado Faria,[3] and her daughter, Reema Faria, along with an individual named Ishak Hussein Aoudi. (*See* Claimants' Response, Ex. C.)[4] According to customs officials, Farha claimed that she had forged the signatures on these checks, and that neither Amado nor Reema Faria was aware that she had these checks in her possession or that she planned to take them out of the country. Farha also allegedly stated that Amado Faria was her husband, and that Reema Faria was her sister—although, in fact, Reema is her daughter. Farha then advised the customs officials that her husband was staying with her "sister," Reema, in Ann Arbor, Michigan, and the interview concluded when she invoked her right to counsel.

Customs agents then telephoned Claimant Amado Faria at his daughter's residence in Ann Arbor. Faria contradicted his wife on a number of points, stating that he had, in fact, signed the two checks bearing his name, that he had witnessed his daughter Reema signing these checks, and that he was aware that his wife had these checks in her possession as she left the United States. According to Faria's deposition testimony in this action, his wife kept the checks so that he would not, in her absence and without her final approval, invest these funds in the purchase of a building in Tampa, Florida. (*See* Plaintiff's Motion, Ex. D, Amado Faria Dep. at 63–64.)

As noted, the two largest negotiable checks at issue in this case, in the amounts of $107,117.98 and $64,553.71, purportedly

---

2. Seven non-negotiable checks totaling $59,000 were returned to Farha in the course of administrative forfeiture proceedings, and are not at issue here.

3. Faria, like his wife, is a naturalized U.S. citizen. The similarity of the couples' last

names—Farha and Faria—apparently is merely coincidental.

4. As discussed below, Aoudi apparently was the purchaser of the Florida property, while Amado and Reema Faria were the prior owners of this property.

were proceeds from the sale of property located at 1115 57th Avenue West, Bradenton, Florida.[5] At some point in 1994 or 1995, Claimant Amado Faria purchased a convenience store at that location, and then, within a few months, he also purchased the land upon which this store was located. These purchases apparently were in the name of either Amado Faria, his daughter Reema Faria, or both,[6] and the family apparently paid around $165,000 for the business and property. In March of 1996, the family sold the business and property to Ishak Aoudi for $360,000, with $252,500 of this amount to be paid in installments of $2,500 per month over 30 years. In 1998, however, Aoudi evidently obtained additional financing and purchased the Farias' remaining interest in the property. The two checks, dated October 28, 1998 and made out to Ishak Aoudi, Amado Faria, and Reema Faria, purportedly were disbursed to the Farias as part of this transaction.

These checks, along with eleven other checks and $8,559.00 in cash, were seized from Leila Farha a month later, on November 28, 1998. On December 8, 1998, a criminal complaint was filed against Farha, charging her with violating the reporting requirements of 31 U.S.C. § 5316 and making false statements to customs officials. On May 1, 2000, Farha was sentenced to six months of pretrial diversion. Farha successfully completed this program, and the criminal proceedings were dismissed without conviction.

On January 18, 1999, Farha filed an administrative petition for return of the seized property. Following lengthy administrative proceedings, a decision was issued in April of 2000 granting Farha's petition in part and denying it in part, with seven of the checks returned to Farha as a result. The Government then commenced this action on April 30, 2001, seeking the civil forfeiture of the remaining six negotiable checks and currency seized from Farha in November of 1998. On May 30, 2001, Claimants Leila Farha and Amado Faria filed verified statements of their claimed interests in this seized property.

### III. *ANALYSIS*

#### A. The Standards Governing the Government's Motion

Through its present motion, the Government seeks summary judgment in its favor pursuant to Fed.R.Civ.P. 56. Under this Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment. As stated in *Celotex:*

---

**5.** The parties have not provided much information regarding the other four negotiable checks at issue here. It appears from the limited record that each is in the amount of $5,000.00, and that they were intended as installment payments for jewelry sold by Farha to a jeweler in Sarasota, Florida.

**6.** At his deposition, Faria expressed indifference as to the names under which various properties and business ventures were held, viewing all of these as "family" holdings.

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy of cases, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989); *see also*

*Nernberg v. Pearce,* 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in resolving the Government's motion.

## B. The Law Governing This Civil Forfeiture Action

■ Before turning to the merits of the Government's motion, the Court first must identify the law that governs this civil forfeiture proceeding. In the past, such matters were governed by the standards set forth at 19 U.S.C. § 1615, under which the Government first had to establish "probable cause" for a forfeiture, and the claimant then bore the burden of establishing a defense to this forfeiture. On April 25, 2000, however, Congress enacted the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub.L. No. 106–185, 114 Stat. 202, 18 U.S.C. § 983 (2000), which has altered the prior rules and standards for civil forfeiture proceedings. At the outset, then, the Court must determine whether this recent legislation governs this action.

Although the Government initially contended otherwise, there is no question that the CAFRA standards are controlling here. By its express terms, the Act "shall apply to any forfeiture proceeding commenced on or after the date that is 120 days after the date of the enactment of this Act," Pub.L. No. 106–185, § 21, 114 Stat. 202, 225—in other words, to any such proceeding commenced on or after August 23, 2000. The Government commenced this action more than eight months later, on April 30, 2001. It follows, then, that the CAFRA standards apply here.

In initially arguing otherwise, the Government asserted that this proceeding should be deemed to have "commenced" back in January of 1999, when Claimants filed an administrative petition seeking the return of the seized property. However, the Court has no difficulty in concluding that *this particular* civil proceeding was

"commenced" in April of 2001, upon the Government's filing of a complaint. *See* Fed.R.Civ.P. 3 ("A civil action is commenced by filing a complaint with the court."); *see also United States v. $100,348.00 U.S. Currency,* 157 F.Supp.2d 1110, 1116 (C.D.Cal.2001). In addition, the Government wisely concedes that its initial position cannot stand in light of the decision in *United States v. Real Property in Section 9, Town 29 North, Range 1 West Twp. of Charlton,* 241 F.3d 796 (6th Cir. 2001), in which the Sixth Circuit held that the CAFRA retroactively applied to a case that was *on appeal* to that Court at the time this legislation was enacted.[7] If this is so, then it cannot be doubted that the CAFRA standards apply in this case, which was brought over a year after the Act became law.

This recent legislation alters the burdens borne by the parties to a civil forfeiture proceeding. Where the Government previously had to demonstrate only "probable cause" to discharge its initial burden, it now must "establish, by a preponderance of the evidence, that the property [at issue] is subject to forfeiture." 18 U.S.C. § 983(c)(1). As the Government recognizes in its reply brief, this elevated standard seemingly precludes any reliance on hearsay, as the Government could have done in a pre-CAFRA case. *See United States v. One Parcel of Property Located*

at 2526 Faxon Ave.; 145 F.Supp.2d 942, 950 (W.D.Tenn.2001).[8] Once the Government meets its burden, a claimant has the burden to establish any defenses to forfeiture, also by a preponderance of the evidence. *See* 18 U.S.C. § 983(d)(1); *see also 2526 Faxon Ave.,* 145 F.Supp.2d at 950–51. With these standards in mind, the Court now turns to the merits of the civil forfeiture sought by the Government in this case.

## C. The Court Cannot Conclude as a Matter of Law that Claimants Have Failed to Establish an Affirmative Defense to Forfeiture.

The Government's forfeiture effort in this case rests upon the authority of 31 U.S.C. §§ 5316(a) and 5317(c). The first of these statutory provisions dictates that a traveler "shall file a report under subsection (b) of this section when the person ... knowingly ... transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time ... from a place in the United States to or through a place outside the United States." 31 U.S.C. § 5316(a). The second provides:

> If a report required under section 5316 with respect to any monetary instrument is not filed (or if filed, contains a material omission or misstatement of fact), the instrument and any interest in

---

7. In so ruling, the Sixth Circuit found that "the statute does not explicitly state whether it applies to pending cases," and that it was necessary to conduct a retroactivity analysis under the standards set forth in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). *Real Property in Section 9,* 241 F.3d at 798. This Court does not necessarily share the appellate court's uncertainty as to whether Congress intended the CAFRA to apply to cases pending at the time of its enactment. To the contrary, Congress seemingly spoke directly to this question, through the provision stating that the Act applies only to proceedings com-

menced at least 120 days *after* its enactment. *See $100,348.00 U.S. Currency,* 157 F.Supp.2d at 1116 (finding that a *Landgraf* analysis was unnecessary in light of this provision). Nevertheless, this Court is bound by the Sixth Circuit's ruling, and, in any event, a plain reading of the statute would yield the same result here.

8. In light of this change, the Government has provided the affidavit of customs inspector Stephen L. Clark, where it previously had produced only the investigative reports prepared by Clark and other officials at the time of the seizure.

property, including a deposit in a financial institution, traceable to such instrument may be seized and forfeited to the United States Government.

31 U.S.C. § 5317(c).

In support of its present motion, the Government argues that, as a matter of law, it has met its burden of establishing that the checks and currency seized from Claimant Leila Farha are subject to forfeiture. The resolution of this issue turns upon whether the evidentiary record conclusively demonstrates a violation of § 5316(a), thereby triggering a right to forfeiture under § 5317(c)—unless, of course, Claimants can establish an affirmative defense to forfeiture. The Government maintains that the evidence establishes such a reporting violation as a matter of law. The Court agrees.

There is no dispute that, upon being questioned by customs officials on November 28, 1998, Leila Farha declared only $9,000 in currency. It is further undisputed that, upon searching Farha's purse, customs officials discovered $8,559.00 in U.S. currency and 13 checks, six of which were negotiable. As justification for her failure to report the checks, Farha states in an affidavit that "I did not know I was required to" make this disclosure, that no customs official "ever explained that I was suppose[d] to report checks," and that "I did not know that U.S. Customs considered checks the same as cash." (Claimants' Response, Ex. B, Farha Aff. at ¶¶ 6–7.)[9]

■ Even accepting the truth of these statements, however, a lack of knowledge of the nature and scope of the statutory reporting requirements does not excuse a failure to comply with these requirements. This Court addressed precisely this issue in *United States v. $468,200.00 in U.S. Currency*, 687 F.Supp. 317, 319–20 (E.D.Mich.1988). In that case, there was "no dispute that the claimants transported the Defendant currency into the United States from Canada," and that they "failed to report the amount upon their entry into this country." 687 F.Supp. at 319. Nevertheless, the claimants opposed forfeiture on the ground that "they were unaware of the reporting requirement of § 5316." 687 F.Supp. at 319. Judge Zatkoff elected to follow the decisions of other Circuits holding that "knowledge of the reporting requirement is not an element" of a § 5316 violation. 687 F.Supp. at 319 (citing cases).[10] In particular, the Court quoted with approval from a Ninth Circuit decision:

> The plain language of the statute controls. "Knowingly" in the statute modifies the verb "transports." The section does not support a reading that knowledge of the reporting requirement is an element of a section 5316 violation.

687 F.Supp. at 319 (quoting *United States v. One Hundred Twenty–Two Thousand Forty–Three Dollars in U.S. Currency*, 792 F.2d 1470, 1474 (9th Cir.1986)).

This Court wholeheartedly agrees with the reasoning and result in *$468,200.00 in U.S. Currency*. The plain language of § 5316(a) imposes a reporting requirement upon individuals who "knowingly ... transport[ ]" more than $10,000 in monetary instruments. The only knowledge that matters, then, is the knowledge that one is carrying monetary instruments in

---

**9.** As noted earlier, there is a factual dispute on this issue, as customs inspector Stephen L. Clark states in an affidavit that he "explained to Ms. Farha the monetary instrument reporting requirements including the need to report the transportation of currency, travelers checks, and any other negotiable monetary instruments of more than $10,000 at one time." (Plaintiff's Reply Br., Ex. M, Clark Aff. at ¶ 7.)

**10.** The Sixth Circuit had not then, and still has not, addressed this issue.

excess of $10,000. Leila Farha does not deny that, on the date in question, she was knowingly carrying checks and currency that totaled more than $10,000. This knowledge triggered her duty to make the report called for under § 5316, without regard for whether she might have misapprehended the requirements imposed by this statute.

Notably, this reading of the statute is shared by nearly every other Circuit that has addressed the issue, in decisions before and since the ruling in *$468,200.00 in U.S. Currency. See, e.g., United States v. $94,000.00 in U.S. Currency*, 2 F.3d 778, 784–85 (7th Cir.1993); *United States v. $359,500 in U.S. Currency*, 828 F.2d 930, 932–34 (2d Cir.1987); *One Hundred Twenty–Two Thousand Forty–Three Dollars in U.S. Currency, supra*, 792 F.2d at 1474; *United States v. Twenty Thousand Seven Hundred Fifty–Seven Dollars and Eighty–Three Cents Canadian Currency*, 769 F.2d 479, 482 (8th Cir.1985). Only the Eleventh Circuit has ruled otherwise, reasoning by analogy from cases involving the imposition of criminal sanctions upon those who "willfully violat[e]" the reporting requirements of § 5316. *See United States v. One Lot of Twenty–Four Thousand Nine Hundred Dollars in U.S. Currency*, 770 F.2d 1530, 1532–34 (11th Cir.1985) (citing 31 U.S.C. § 5322).[11] Yet, as the Second Circuit has pointed out, there is an important distinction between the relevant criminal and civil provisions, with the latter, § 5316, being "devoid of any reference to willfulness or intent to violate the reporting requirement." *$359,500 in U.S. Currency*, 828 F.2d at 933.

■ Consequently, because the undisputed record establishes that Leila Farha knowingly transported monetary instruments of value exceeding $10,000, yet did not report this fact to customs officials, the Government has met its threshold burden of demonstrating that the Defendant property is subject to forfeiture.[12] The

---

**11.** Although Claimants cite a Seventh Circuit case that appears to endorse the same rule, *see United States v. Forty–Eight Thousand, Five Hundred Ninety–Five Dollars*, 705 F.2d 909 (7th Cir.1983), the Seventh Circuit later deemed this decision not controlling, in light of its somewhat unusual procedural posture, and instead elected to adopt "the view expressed by the majority of the circuits." *See $94,000.00 in U.S. Currency*, 2 F.3d at 784–85 & n. 4.

**12.** Claimants question whether this is true for the entirety of the Defendant property. In particular, they note that Leila Farha did report $9,000 in currency, and they contend that this disclosure should exempt the $8,559.00 cash portion of the Defendant property from forfeiture. As the Government points out, however, the case law on this subject—limited though it may be—indicates otherwise. In *United States v. $173,081.04 in U.S. Currency*, 835 F.2d 1141, 1143–44 (5th Cir.), *cert. denied*, 488 U.S. 850, 109 S.Ct. 133, 102 L.Ed.2d 106 (1988), the Court held that all of the monetary instruments seized from an individual on a single occasion for a reporting violation are subject to forfeiture, and

that only the Secretary of the Treasury, and not the judiciary, has the authority to remit any portion of the seized proceeds. This ruling was based principally upon a federal regulation which states:

Any currency or other monetary instruments which are in the process of any transportation with respect to which a report is required ... are subject to seizure and forfeiture to the United States if such report has not been filed as required ..., or contains material omissions or misstatements. The Secretary may, in his sole discretion, remit or mitigate any such forfeiture in whole or in part upon such terms and conditions as he deems reasonable.

31 C.F.R. § 103.58. The Court reasoned that "[b]y negative implication, no power to ameliorate an individual forfeiture has been conferred on the federal courts." *$173,081.04 in U.S. Currency*, 835 F.2d at 1144. The Court found further support for this result in the language of 31 U.S.C. § 5317(c), which authorizes seizure and forfeiture if a required report is not filed or, "if filed, contains a material omission or misstatement of fact." 31 U.S.C. § 5317(c). In the present case,

question becomes whether Claimants are foreclosed under the present record from establishing an affirmative defense to forfeiture. In particular, Claimants argue that Amado Faria, at least, can avoid forfeiture under an "innocent owner" theory.[13] The Court now turns to this issue.

Although the Government has questioned whether the "innocent owner" defense was available under the prior state of the law, CAFRA expressly provides for it:

**(d) Innocent owner defense.—**

(1) An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute. The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence.

(2)(A) With respect to a property interest in existence at the time the illegal conduct giving rise to forfeiture took place, the term "innocent owner" means an owner who—

(i) did not know of the conduct giving rise to forfeiture; or

(ii) upon learning of the conduct giving rise to the forfeiture, did all that could reasonably be expected un-

der the circumstances to terminate such use of the property.

18 U.S.C. § 983(d).

■ The Court finds that outstanding issues of fact preclude a determination as a matter of law as to Amado Faria's ability to invoke this "innocent owner" defense to forfeiture. The record clearly demonstrates, both through Faria's statements to customs officials at the time and through his deposition testimony, that Faria knew that his wife was carrying negotiable checks in amounts well in excess of $10,000 as she prepared to leave the country on November 28, 1998. Yet, the Court cannot accept the Government's assertion that this evidence alone defeats any claim of innocent ownership. Simply stated, the "conduct giving rise to forfeiture" in this case was *not* Leila Farha's mere possession of the Defendant property; if she had disclosed this fact to customs officials, there would have been no illegality upon which to base a forfeiture. Rather, the offending conduct was Farha's failure to report the monetary instruments she was carrying. There is no evidence that Faria knew of this conduct, or that he could or should have anticipated that his wife would

---

then, it would appear that Leila Farha's failure to fully and accurately report all of the monetary instruments in her possession—and, in particular, her "material omission" of the negotiable checks—subjected the entirety of the monetary instruments in her possession to seizure and forfeiture, absent a defense to forfeiture.

13. The parties also refer to a "legitimate source" defense to forfeiture, apparently viewing the Supreme Court's decision in *United States v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), as recognizing such a defense. At least one other court agrees—in *United States v. U.S. Currency in Amount of $119,984*, 129 F.Supp.2d 471, 476 (E.D.N.Y.2001), the Court read *Bajakajian* as establishing the rule that "currency derived from a legal source may not be subject to forfeiture."

This Court construes the decision in *Bajakajian* somewhat differently. Although the Supreme Court observed that the currency seized in that case "was the proceeds of legal activity and was to be used to repay a lawful debt," the Court did not rely upon these facts to altogether preclude forfeiture, but instead cited them as factors in its determination that forfeiture of the entire $357,144 seized from the defendant would violate the Excessive Fines Clause of the Eighth Amendment. *Bajakajian*, 524 U.S. at 337–38, 118 S.Ct. at 2038. In the present case, Claimants have separately argued that the forfeiture sought by the Government would constitute an excessive fine. Accordingly, the Court elects to address the "legitimate source" issue below, in the context of its excessiveness inquiry.

fail to make the report mandated under 31 U.S.C. § 5316. To the contrary, Faria has stated in an affidavit that "I did not know that my wife would fail to report checks to U.S. Customs," (Claimants' Response, Ex. A, Faria Aff. at ¶ 4), and nothing in the record warrants the rejection of this statement as a matter of law.

The same cannot be said, however, for Leila Farha's appeal to the "innocent owner" defense. She clearly *cannot* claim lack of knowledge of the conduct giving rise to the forfeiture, as she herself committed the act—*i.e.*, the failure to report—that triggered these proceedings. Farha also confronts another obstacle to any claim of innocent ownership, because it is far from clear that she possessed the requisite "property interest" in the negotiable checks she was carrying. The checks were made out to her husband and daughter, and there is no evidence to suggest that these payees intended to give these funds to Farha for her own use. Rather, the record indicates that Farha held the checks only temporarily and for "safekeeping"—she states in an affidavit, for example, that she "did not intend to keep the checks overseas," that she "was planning to return with the checks," and that she took them in order to prevent her husband from investing in a business in her absence and without her input. (Claimants' Response, Ex. B, Farha Aff. at ¶¶ 9, 11.) Accordingly, only Amado Faria, and not

Leila Farha, may go forward on an "innocent owner" defense to forfeiture.[14]

## D. The Present Record Does Not Permit a Determination as a Matter of Law as to the Purported Excessiveness of the Forfeiture Sought in This Case.

■ In addition to arguing that Amado Faria's status as an "innocent owner" precludes the forfeiture sought by the Government in this case, Claimants also challenge the Government's entitlement to summary judgment and an order of forfeiture on the ground that the amount of the forfeiture would violate the Excessive Fines Clause of the Eighth Amendment. The Court agrees that issues of fact stand in the way of a determination as a matter of law as to whether the forfeiture sought in this case would constitute an "excessive fine" as prohibited by the Eighth Amendment.

The Supreme Court's decision in *Bajakajian, supra*, sets forth several principles that are relevant to the present inquiry. First, although that case involved a criminal forfeiture, the Court emphasized that a statutory forfeiture, whether civil or criminal, "is a 'fine' for Eighth Amendment purposes if it constitutes punishment even in part, regardless of whether the proceeding is styled *in rem* or *in personam*." *Bajakajian*, 524 U.S. at 331 n. 6, 118 S.Ct. at 2035 n. 6. Next, the Court observed that "[t]he touchstone of the constitutional in-

---

14. The Court notes that this ruling is limited to the two larger negotiable checks that comprise the substantial majority of the Defendant proceeds. Regarding the $8,559.00 in currency found in Leila Farha's possession, the question of ownership is far different, as it appears from the record that this money belonged to Ms. Farha. Amado Faria, then, could not establish an "innocent owner" defense to the forfeiture of this currency, since he apparently lacks the requisite property interest. *Cf.* 18 U.S.C. § 983(d)(5) (setting forth the procedures for a court to follow in the

event that a claimant has only a "partial interest in property otherwise subject to forfeiture"). Moreover, for the reasons stated earlier, Leila Farha is not an "innocent" owner of this currency, since she plainly knew of the conduct giving rise to the forfeiture. Finally, regarding the remaining four negotiable checks, the Court already has noted the lack of information in the record as to these instruments, so that the Court cannot say whether an "innocent owner" or other defense might preclude their forfeiture.

quiry under the Excessive Fines Clause is the principle of proportionality," and it explained that this principle dictates that "[t]he amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." 524 U.S. at 334, 118 S.Ct. at 2036. Finally, it is evident from the Court's decision that the gravity of a failure-to-report violation, standing alone, is not necessarily sufficient to justify the forfeiture of the entire amount not reported. To the contrary, the Court held that a $357,144 forfeiture was constitutionally impermissible under the facts before it, where the defendant's failure-to-report violation "was unrelated to any other illegal activities," the seized currency "was the proceeds of legal activity and was to be used to repay a lawful debt," and the defendant did not "fit into the class of persons for whom the [reporting] statute was principally designed: He is not a money launderer, a drug trafficker, or a tax evader." *Bajakajian,* 524 U.S. at 337–38, 118 S.Ct. at 2038.

The recent enactment of CAFRA reaffirms many of these same points. Specifically, even if *Bajakajian* were viewed as limited to the context of criminal forfeitures, CAFRA expressly authorizes a claimant in a civil forfeiture proceeding to "petition the court to determine whether the forfeiture was constitutionally excessive." 18 U.S.C. § 983(g)(1). CAFRA also adopts the *Bajakajian* standards for this inquiry, stating that "[i]n making this [excessiveness] determination, the court shall compare the forfeiture to the gravity of the offense giving rise to the forfeiture." 18 U.S.C. § 983(g)(2). Finally, the statute sets forth a procedure for conducting this inquiry, providing that "[t]he claimant shall have the burden of establishing that the forfeiture is grossly disproportional by a preponderance of the evidence at a hearing conducted by the court without a jury." 18 U.S.C. § 983(g)(3).

In light of these principles and standards, the Court readily concludes that the excessiveness of the forfeiture sought by the Government is not capable of determination under the present record. To the extent that the source of the Defendant proceeds or the intended purpose for taking them abroad are relevant to the inquiry, the parties hold sharply divergent views on these matters, and each enjoys some degree of evidentiary support. Claimants contend that the two largest negotiable checks are the entirely lawful proceeds of their sale of a business and property in Florida, and they state that Leila Farha was carrying these checks purely for safekeeping, with no intent of cashing them abroad. The Government, in contrast, notes that neither Leila Farha nor Amado Faria has filed a tax return for the years 1996 to 2000, and cites this as evidence that the checks were being taken overseas for the purpose of tax evasion, particularly since Farha's intended destination, Israel, purportedly is known to lack a regulatory system that could detect or report money laundering or other suspicious financial transactions.

Plainly, the parties' assertions can only be tested under a complete evidentiary record, and their validity will turn largely upon credibility assessments that cannot be made upon a motion for summary judgment. In addition, the record is silent or incomplete as to other important considerations. For example, the parties debate the legal significance of Claimants' failure to report on any tax return the proceeds of the 1998 sale of the Florida property— Claimants assert that the Government's seizure of these proceeds obviated any need to claim them as income or capital gains, while the Government contends that Claimants' receipt of these proceeds a month before their seizure gave rise to a requirement to report them and pay any resulting taxes. Neither side, however,

has addressed this issue to the Court's satisfaction. Likewise, some of the factors noted by the *Bajakajian* Court as significant to an excessiveness inquiry—*e.g.*, the statutory and Sentencing Guidelines penalties faced by a similarly situated defendant who commits a comparable violation—are not disclosed in the present record.

Given all of these relevant fact-intensive considerations, it is not surprising that CAFRA calls upon the courts to conduct a hearing to resolve the proportionality inquiry. *See* 18 U.S.C. § 983(g)(3). Regardless of whether such a matter may properly be resolved on motion for summary judgment, it is clear that it cannot be in this case. Accordingly, the Court reserves decision on this issue pending the development of a more complete evidentiary record, either at trial or at a separate hearing devoted solely to this question.[15]

### E. Government's Delay in Commencing This Action Did Not Violate Claimants' Due Process Rights.

As their final challenge to the Government's motion, Claimants argue that the Government's forfeiture effort is barred by virtue of its delay in bringing this action. The Court finds, however, that Claimants have failed to identify any sort of due process violation in the Government's pursuit of forfeiture in this case.

■ As applied to civil forfeiture proceedings, the Fifth Amendment's guarantee of due process requires that a dispossessed property owner be afforded a "meaningful hearing at a meaningful time." *United States v. Eight Thousand Eight Hundred and Fifty Dollars in U.S. Currency*, 461 U.S. 555, 563, 103 S.Ct. 2005, 2011, 76 L.Ed.2d 143 (1983). In determining whether this standard has been met, a court should consider four factors: (i) the length of the delay, (ii) the reason for the delay; (iii) the timing of the claimant's assertion of the right to a judicial hearing; and (iv) whether the claimant has been prejudiced by the delay. 461 U.S. at 564–69, 103 S.Ct. at 2012–14.

■ Claimants' showing on these points is cursory at best. In the span of a single paragraph in their brief, they state: (i) that there was a 29–month delay between the seizure of the Defendant property and the commencement of this suit; (ii) that there "exists no reasonable basis" for this delay; and (iii) that "it cannot be said that Claimants were not prejudiced by the delay," where they have been compelled to rely upon Social Security disability benefits and the proceeds from a past real estate transaction in lieu of the seized currency and checks. (*See* Claimants' Response at 22.)

The Court finds that Claimants have failed to demonstrate a due process violation. First, regarding the 29–month delay and the reasons for it, the Government points out that roughly 18 months of this period were devoted to the resolution of Claimant Leila Farha's administrative petition for remission. The Supreme Court has characterized the pendency of an administrative petition as a "weighty factor" in the due process inquiry, particularly since "[t]his delay can favor both the claimant and the Government" by, for example, occasionally eliminating the need for "unnecessary and burdensome court proceedings." *Eight Thousand Eight Hundred and Fifty Dollars*, 461 U.S. at 566–67, 103 S.Ct. at 2013. More generally, the Government cites cases in which comparable delays were found not to offend

---

15. Because the evidence at trial could shed considerable light on this issue, and because the resolution of other matters—*e.g.*, Claimants' "innocent owner" defense—might obviate the need to conduct an excessiveness inquiry, or might otherwise affect this inquiry, it is likely that the Court will elect to address this issue in a post-trial hearing.

the constitutional guarantee of due process. *See, e.g., United States v. $292,888.04 in U.S. Currency,* 54 F.3d 564, 567 (9th Cir.1995) ("The district court correctly found that the thirty-month delay between seizure of the funds and initiation of forfeiture proceedings, although lengthy, was not unreasonable and did not offend due process."); *United States v. Fifty Seven Thousand, Four Hundred and Forty-Three Dollars,* 42 F.Supp.2d 1293, 1298–99 (S.D.Fla.1999) (holding that a 23–month delay did not violate due process, in part because much of the delay was attributable to the claimant's participation in parallel administrative proceedings). Thus, while the 29–month delay in this case admittedly is significant, it cannot be said that either the length of or the reasons for this delay would, by themselves, tend to suggest a due process violation.

In contrast, the remaining two factors weigh decisively against a finding of a due process violation. As noted by the Supreme Court, "[a] claimant is able to trigger rapid filing of a forfeiture action if he desires it," through a variety of formal and informal procedural devices. *Eight Thousand Eight Hundred and Fifty Dollars,* 461 U.S. at 569, 103 S.Ct. at 2014. The record provided to the Court indicates that Claimants did not take the first step in commencing this judicial proceeding until July 17, 2000, some 20 months after the seizure, when they filed a cost bond. This cannot be viewed as a particularly prompt assertion of the right to a judicial hearing. Finally, and most importantly, Claimants have not identified any prejudice of the sort contemplated in the controlling Supreme Court precedent. "The primary inquiry here is whether the delay has hampered the claimant in presenting a defense on the merits through, for example, the loss of witnesses or other important evidence." 461 U.S. at 569, 103 S.Ct. at 2014. The only prejudice cited by Claimants is their inability to make use of the Defendant property; they have failed to suggest any way in which the Government's delay might have prejudiced their ability to effectively litigate their claims in this action. Consequently, upon weighing the four factors identified by the Supreme Court, this Court cannot say that Claimants have been denied due process of law.

## IV. *CONCLUSION*

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's January 31, 2002 Motion for Summary Judgment and Final Order of Forfeiture is DENIED.[16]

---

**16.** As noted earlier, to the extent that Claimants' response brief could be construed as a cross-motion for summary judgment, this motion necessarily is also denied.